**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 27, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

MATTHEW DALE SAMPLE,

    Defendant - Appellee.

No. 17-2086

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:15-CR-04265-JCH-1)**
_____

Fred J. Federici, United States Attorney's Office, Albuquerque, New Mexico (James D. Tierney, United States Attorney's Office, Albuquerque, New Mexico, with him on the briefs), for Plaintiff-Appellant.

Ray Twohig, Albuquerque, New Mexico for Defendant-Appellee.

_____

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.
_____

**LUCERO**, Circuit Judge.
_____

    The United States government appeals the sentence of Matthew Sample,

following his guilty plea to one count of frauds and swindles under 18 U.S.C. § 1341

and two counts of wire fraud under 18 U.S.C. § 1343. In sentencing Sample to a

five-year term of probation on the rationale that such a sentence would allow him to repay his victims, the district court essentially sentenced Sample based on his income. We conclude that this sentence was unreasonable. Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b), we reverse and remand for resentencing.

**I**

Sample began working as a licensed investment advisor and registered broker in 1995. He worked for several large brokerage firms and was recognized as a top advisor. In 2006, Sample began operating the Vega Opportunity Fund (the "Vega Fund"). One year later, in 2007, he closed the fund after it had lost sixty-five percent of its value. Sample had been diverting funds invested in the Vega Fund for his own personal expenses, and had been providing investors with false account statements and quarterly updates on their purported investments.

After closing the Vega Fund, Sample moved from Chicago, Illinois, to Albuquerque, New Mexico. In October of 2009, he began a hedge fund called the Lobo Volatility Fund, LLC (the "Lobo Fund"). He reverted to form. In a scheme similar to that perpetrated on investors in the Vega Fund, Sample provided false monthly statements showing appreciation in value, engaged in misleading email correspondence about market strategies, and provided false tax reports to Lobo Fund investors. All the while, Sample diverted a total of $1,086,453.62 from investors for his personal use.

In December of 2015, Sample was charged with one count of defrauding and swindling in violation of 18 U.S.C. § 1341 and two counts of wire fraud, in violation of 18 U.S.C. § 1343. He pled guilty to all charges.

On sentencing, the government requested a sentence at the low end of Sample's Guidelines range, which was 78 to 97 months' imprisonment. It argued that the impact upon Sample's victims had been profound: some lost their entire life savings, others were unable to retire as planned, and many expressed profound emotional distress as a result of Sample's betrayal. Sample's conduct was cast by the government as selfish, callous, and dishonest. The government referenced his attempts to convince investors to testify for him before the Securities and Exchange Commission and in his criminal case as evidence of his selfishness.

The government noted Sample's previous unadjudicated conduct in Illinois, regarding the Vega Fund, now imported to New Mexico, and argued that Sample's betrayal of his fiduciary obligations and the trust placed in him as a financial professional demanded a significant sentence. It reasoned that Sample's sentence should reflect the seriousness of white collar crime and deter other financial professionals from similar conduct. Although the government acknowledged that less prison time would aid in victim restitution, restitution was unlikely to occur because Sample had filed a petition in bankruptcy. Even were he able to enhance the opportunity for restitution, the government urged Sample should serve the same prison time for his crimes as another defendant with a lower earning capacity would suffer.

3

To the contrary, Sample argued that he should receive consideration for probation based on his unblemished record in the securities industry before 2008, his charity and volunteer work during that time, and his previous financial support of his family and friends. Sample construed his crimes as an aberration resulting from stress. That stress arose from, in part, the 2008 financial crisis, the collapse of his financial practice, his divorce, acceptance of his gay identity, and his move to New Mexico. He began using alcohol, cocaine, and ecstasy, which he claimed contributed to his reckless behavior. Essentially, Sample rationalized that he swindled his clients in order to provide for his family and entertain his friends. He sought acknowledgement that at the time of sentencing, he was gainfully employed, engaged, and was free of drugs and alcohol. Continued employment with a six-figure annual income, Sample told the court, would allow him to make significant restitution payments to his former investors.

At Sample's sentencing, the district court acknowledged that Sample's crimes were "quite shameful" and indicated that it was ignoring Sample's statements as the usual "right things" most defendants mouthed at sentencing. The court chose instead to focus on the impact that the crimes had upon the victims. Every defrauded investor "wants their money back," said the court. "A prison term would end the current job that you have, with no guarantee that you would have this job or one like it when you got out of jail," the court explained, "I want you to keep your job, because I want you to have a good job to pay these victims back."

In choosing probation, the court noted that society at large had suffered, and accordingly imposed what the court described as strict probation conditions. The court explicitly indicated that if Sample did not have his "current job and [his] ability to make these payments, I might be doing something different" and that "one of the reasons I'm willing to place the defendant on probation was because of this job and his earning capacity." Sample was sentenced to a five-year term of probation.

Special conditions were imposed. Sample is banned from using or possessing alcohol or drugs and from acting in a fiduciary capacity. He is required to obtain permission from the probation office for personal travel and incurrence of new credit charges. Sample is also required to maintain gainful employment, allow the probation office access to his financial information, participate in a substance abuse treatment program, and undergo regular drug testing. He is ordered to pay restitution to his victims.

The government brings this appeal.

## II

We are urged to hold that Sample's sentence is substantively unreasonable because the district court gave improper weight to Sample's income and consequent ability to pay restitution. However, the government asserts that its substantive challenge may also be considered procedural in nature. Our jurisprudence regarding whether such arguments are properly considered procedural or substantive has not been fully developed. See United States v. Sayad, 589 F.3d 1110, 1116-17 (10th Cir. 2009) (summarizing conflicting precedent regarding the proper framing of a

5

challenge based on a sentencing court's consideration of an impermissible factor). Because the government describes its challenge as addressed to the weight that the district court gave to this factor, rather than whether it is permissible, we will consider it a substantive challenge. United States v. Pinson, 542 F.3d 822, 835-36 (10th Cir. 2008) ("[T]he weight the district court places on certain factors is reviewed for substantive unreasonableness, use of an improper factor is reviewed for procedural unreasonableness.").

"Review for substantive reasonableness focuses on whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." United States v. Friedman, 554 F.3d 1301, 1307 (10th Cir. 2009) (quotation omitted). We review the substantive reasonableness of a sentence for abuse of discretion. Sayad, 589 F.3d at 1116. This is a deferential standard: "a district court's sentence is substantively unreasonable only if it is arbitrary, capricious, whimsical, or manifestly unreasonable." Id. (quotation omitted). Nevertheless, "appellate review continues to have an important role to play and must not be regarded as a rubber stamp." Pinson, 542 F.3d at 836.

We do not apply "a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." Gall v. United States, 552 U.S. 38, 47 (2007). But in examining a sentence that varies from that suggested by the Sentencing Guidelines, we must determine whether "the justification [for varying from the Guidelines range] is sufficiently compelling to support the degree of variance." Id. at 50. It is

6

"uncontroversial that a major departure should be supported by a more significant justification than a minor one." Id.

We are puzzled by the court's implicit suggestion that if the defendant were poor and unemployed, he might get a prison term. Our court has previously explained in an unpublished decision that courts should not rely on a defendant's wealth in fashioning a sentence. See United States v. Morgan, 635 F. App'x 423, 446 (10th Cir. 2015) (unpublished) (concluding that focusing on the collateral consequences of a conviction "impermissibly favor[s] criminals . . . with privileged backgrounds");[1] see also United States v. Kuhlman, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); United States v. Stall, 581 F.3d 276, 286 (6th Cir. 2009) ("We do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose."); United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Business criminals are not to be treated more leniently than

---

[1] In Morgan, as with some of the out-of-circuit cases cited infra, the court analyzed the procedural reasonableness of considering these factors. Id. But see id. at 455-69 (Holmes, J., concurring) (considering the issue as a substantive reasonableness challenge). We conclude that these cases provide persuasive guidance on the related issue of whether a district court imposes a substantively unreasonable sentence by granting these factors significant weight.

members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity."). Cf. 28 U.S.C. § 994(d)(11) (requiring that the Commission "shall assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders.")

During its final sentencing determination, the district court repeatedly stressed the importance of restitution in its decision. And it explicitly based its sentencing decision in large measure on Sample's ability to repay his victims. The court stated that if Sample did not have his "current job and [his] ability to make these payments, I might be doing something different" and that "one of the reasons I'm willing to place the defendant on probation was because of this job and his earning capacity." The need to provide restitution to victims is one of the factors district courts must consider in fashioning a sentence. See 18 U.S.C. § 3553(a)(7). However, the district court's reliance on Sample's salary as overriding all other sentencing considerations exceeded the bounds of permissible choice.

As the district court noted, Sample's offense was serious and it inflicted considerable harm upon his victims. See § 3553(a)(2)(A) (requiring that district courts consider "the need for the sentence imposed" to "reflect the seriousness of the offense"). He misappropriated more than a million dollars. That seriousness alone weighs against the lenient nature of the sentence that the trial court imposed. United States v. Walker, 844 F.3d 1253, 1256 (10th Cir. 2017) ("[T]he length of the sentence

should reflect the harm done and the gravity of the defendant's conduct." (quotations omitted)).

Similarly, the district court failed to adequately balance the need to "promote respect for the law," "provide just punishment for the offense," and "afford adequate deterrence to criminal conduct." § 3553(a)(2)(A), (B). "General deterrence is one of the key purposes of sentencing." Walker, 844 F.3d at 1257 (quotation omitted). Congress has recognized that general deterrence is particularly important in the context of white collar crime. See United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[T]he Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense."); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime."). White collar criminals may be particularly susceptible to general deterrence because "[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." Kuhlman, 711 F.3d at 1329 (quotation and alteration omitted)).

In imposing minimal sentences on white-collar criminals, courts "raise concerns of sentencing disparities according to socio-economic" status. United States v. Levinson, 543 F.3d 190, 201 (3d Cir. 2008); see also United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "minimiz[ing]

discrepancies between white- and blue-collar offenses, and limit[ing] the ability of those with money or earning potential to buy their way out of jail"). The district court failed to sufficiently consider "the need to avoid unwarranted sentence disparities." § 3553(a)(6). The vast majority of fraud offenders convicted in 2016 were imprisoned, and for those with a criminal history level such as Sample's, Category II, the mean length of imprisonment was 39 months. U.S. Sent'g Comm'n, Sourcebook of Fed. Sent'g Statistics, Table 12, Table 14 (2016). Of course, the Guidelines themselves are designed to restrain unwarranted disparities. See Gall, 552 U.S. at 54. For an individual with Sample's particular characteristics, the Guidelines suggest a range of 78 to 97 months' imprisonment.

We are not permitted to treat probation as if it were no punishment at all. Id. at 47. However, "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms." Id. Moreover, the particular terms of Sample's probation provide overly lenient punishment for a crime the Sentencing Commission considers deserving of approximately seven years in federal prison. Sample may travel for work, pay his fiancé's college tuition, and even contribute to his 401(k) retirement fund. He need not report to the Bureau of Prisons on weekends, engage in community service, or even suffer restriction to his own home. Although the district court indicated that it would not "look favorably" upon his "living the high life," he is not legally prohibited from any number of leisure activities by any condition of his sentencing.

The record is clear that the district court imposed a lenient probation sentence because Sample's high income allowed him to make restitution payments to his victims. Our system of justice has no sentencing discount for wealth. <u>Stefonek</u>, 179 F.3d at 1038. Other than Sample's earning capacity, the district court identified a few factors in mitigation: (1) Sample's lack of a serious criminal history; (2) his conduct on pretrial release; (3) his acceptance of responsibility; and (4) the likelihood that he would not reoffend. These factors, considered cumulatively, do not justify the extent of the district court's variance from the Guidelines range. Examining the § 3553(a) sentencing factors without considering Sample's earning capacity, it is not possible to conclude that the probation Sample received, with its lenient conditions, was a reasonable sentence. The seriousness of his crime, the importance of general deterrence, and consistency in sentencing all clearly weigh against such an extreme variance, and Sample's limited criminal history and pretrial compliance with the law cannot sustain a finding to the contrary. Resentencing is required.

### III

For the foregoing reasons, we **VACATE** Sample's sentence and **REMAND** for resentencing. The parties' motions to supplement the appendix are **DENIED**.

11